UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ZOILA D. ATENCIO,

                Plaintiff,

           -against-

UNITED STATES POSTAL SERVICE,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14 Civ. 7929 (AJP)

**OPINION & ORDER**

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Zoila Atencio brought this action against the United States Postal Service ("USPS") alleging violations of the Americans with Disabilities Act and the Rehabilitation Act. (See generally Dkt. No. 23: 2d Am. Compl.)  On November 19, 2015, Judge Woods dismissed Atencio's ADA claims and counts three and four of her Second Amended Complaint.  (Dkt. No. 34: 11/19/15 Opinion.)  Atencio's two surviving claims allege that USPS violated the Rehabilitation Act when it failed to engage in an interactive process to determine a reasonable accommodation of her disability, and subjected her to retaliatory harassment because she sought an accommodation.  (2d Am. Compl. ¶¶ 129-37.)  Presently before the Court is USPS's motion for summary judgment on Atencio's remaining claims.  (Dkt. No. 68: 6/14/16 Mot.)  The parties have consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 40.)  For the reasons set forth below, the motion is GRANTED in part and DENIED in part; USPS is granted summary judgment on Atencio's reasonable accommodation claim, but the retaliation claim survives for trial.

**FACTS**

**Atencio's Employment at USPS**

In July 2000, Atencio began work for USPS as a letter carrier in Harrison, New York, and in 2001 was transferred to Manhattan and eventually assigned to Grand Central station.  (Dkt. No. 70: USPS Rule 56.1 Stmt. ¶¶ 1-2; Dkt. No. 79: Atencio Rule 56.1 Stmt. ¶¶ 1-2.)  Atencio applied for the "T-6 carrier" (or "Carrier Technician") position, "which required her to cover five different routes and deliver the mail on those routes when the letter carrier responsible for the routes was out, sick or on vacation."  (USPS & Atencio Rule 56.1 Stmts. ¶ 2.)  Atencio was aware of the particular routes for which she would be responsible when she bid on the position.  (USPS & Atencio Rule 56.1 Stmts. ¶ 2.)  The T-6 carrier position "was a higher-level position with a higher level of pay than a mail carrier who was assigned one specific route."  (USPS & Atencio Rule 56.1 Stmts. ¶ 2.)

The T-6 carrier job description provides, in relevant part: "'As principal carrier for a designated group of no less than five letter routes, delivers mail on foot or by vehicle on the routes during the absence of the regularly assigned carrier and provides job instruction to newly assigned carriers.'"  (USPS & Atencio Rule 56.1 Stmts. ¶ 4; Dkt. No. 71: Tarczynska Aff. Ex. M.)  The T-6 carrier "'performs [the] complete and customary duties of a carrier (city or special).'"  (USPS & Atencio Rule 56.1 Stmts. ¶ 4; Tarczynska Aff. Ex. M.)  The city carrier job description, i.e., the role that a T-6 carrier would need to fill on her five assigned routes, provides that the city carrier "'[d]elivers and collects mail'" and "'[m]ay be required to carry mail weighing up to 35 pounds in shoulder satchels or other equipment and to load or unload container of mail weighing up to 70 pounds.'"  (USPS & Atencio Rule 56.1 Stmts. ¶ 5; Tarczynska Aff. Ex. N at 1; see also Dkt. No. 72: Towns Aff. ¶ 5 ("The position of being a letter carrier, including a T-6 carrier, is a physically

3

demanding position.").)

As a T-6 carrier, Atencio's first task each day was to go to the supervisor's office to obtain her route assignment.  (Dkt. No. 76: Atencio Aff. ¶ 32.)  Once Atencio knew her route assignment, she would go to the location inside the post office set aside for that particular route, where there was a "case," i.e., a ledge where a tray or tub of mail may be placed.  (Id.)  The case contained various slots labeled with different postal customers or particular delivery points.  (Id.)  Atencio would gather the mail for her assigned route, sort and bundle the mail by delivery location, box the mail, and place it in tubs.  (Atencio Aff. ¶ 33.)  Atencio used a mail cart to wheel the mail containers to the post office loading dock; from the loading dock, a driver would take the containers to the relay points.  (Id.)  A USPS driver would deliver directly to "high volume" customers which "were an exception to the delivery process." (Atencio Aff. ¶ 62.)  Atencio would take the remainder of the mail to her route using a mail cart.  (Atencio Aff. ¶ 33.)  After October 18, 2011, when at a relay point, Atencio would load mail onto her cart tub by tub and take the mail to each customer's location.  (Id.)

In sum, after arriving at her route case, Atencio's responsibilities were "basically no different than a regular carrier." (Atencio Aff. ¶ 32.)  Specifically, Atencio states: "As a carrier, my basic function is to deliver mail to postal customers, large and small.  As a regular carrier or a T-6 carrier, my basic function is to deliver mail from a particular post office to postal customers on a defined route." (Atencio Aff. ¶ 33.)

**Atencio's Injury**

On August 10, 2011, Atencio fell while on the job and was injured.  (USPS & Atencio Rule 56.1 Stmts. ¶ 6; Dkt. No. 77: Lira Aff. Ex. 7: Atencio Dep. at 156-57.)  Atencio returned to work on October 18, 2011, and submitted a medical note stating that she "could not lift

more than 10 pounds and could not lift her left arm above the shoulder." (USPS & Atencio Rule 56.1 Stmts. ¶ 8.) Atencio was given an "Offer of Modified Assignment (Limited Duty)" that same day. (USPS & Atencio Rule 56.1 Stmts. ¶ 9; Tarczynska Aff. Ex. F: 10/18/11 Offer.) The limited duty offer modified Atencio's job duties by requiring her to case mail for five hours and deliver mail for three hours. (Tarczynska Aff. Ex. F: 10/18/11 Offer.)[1] USPS claims that Atencio "signed and accepted" the offer; Atencio claims that she was coerced to sign the form because the only alternative accommodation offered by USPS was unpaid leave. (Compare USPS Rule 56.1 Stmt. ¶ 9, with Atencio Rule 56.1 Stmt. ¶ 9; Atencio Aff. ¶¶ 7-11; Atencio Dep. at 175-76.)

Atencio submitted a second medical note dated December 22, 2011, which restricted her from lifting more than five pounds. (USPS & Atencio Rule 56.1 Stmts. ¶ 10; Tarczynska Aff. Ex. G: 12/22/11 Letter.) On January 20, 2012, supervisor Steve Buono issued Atencio a "Notice of 7-Day No Time Served Paper Suspension" for an incident on January 4, 2012 when she failed to deliver all of the mail on her route. (USPS & Atencio Rule 56.1 Stmts. ¶ 15; Dkt. No. 65: Buono Aff. ¶ 5 & Ex. A: 1/20/12 Notice; Atencio Dep. at 192-94.) The notice states that Atencio previously was advised that if she needed help delivering mail to a particular floor, she was required to submit a Form 3996 on a daily basis as needed (1/20/12 Notice at 1), which "is the standard form that all mail carriers are required to complete when they are seeking assistance on a route" (Buono Aff. ¶ 6). The notice further states that, on January 4, 2012, Buono repeatedly asked Atencio for a Form 3996 to schedule assistance for her route that day, but she never responded. (1/20/12 Notice at 1.) Atencio later submitted a piece of paper (not a Form 3996) requesting assistance for four floors of a particular building; Buono "instructed another carrier to pivot" from his own route to

---

[1] "Casing" mail means sorting it into bundles in preparation for delivery. (Towns Aff. ¶ 5.)

deliver to the floors.  (<u>Id.</u>; Atencio Dep. at 197-98.)  Atencio nonetheless failed to deliver to four other floors not listed on the paper she submitted, despite never requesting any additional delivery assistance for those floors.  (1/20/12 Notice at 1; Atencio Dep. at 197-98.)

Atencio does not recall being specifically advised to submit a Form 3996 as needed prior to January 4, 2012.  (Atencio Aff. ¶ 84.)  Even after Atencio was so advised, she claims that "management used the requirement as another method to torment" her.  (Atencio Aff. ¶ 89.)  For example, Atencio asserts that she often was told that she needed to submit the form by 10:30 A.M., even though the assistance she needed would not become apparent until later in the day once all the mail was processed.  (<u>Id.</u>)  Atencio also claims that she was not permitted to keep a supply of the forms, which were stored on the supervisor's desk; when she would leave her route case to retrieve the form, often a "supervisor would scream at [her] to return to the route."  (Atencio Aff. ¶ 90.)  Atencio would write down the floors for which she needed help on whatever paper was available, but then be "subjected to further abuse and threatened with discipline for failing to use the Form 3996."  (<u>Id.</u>)  Atencio admits, however, that she was "generally not denied the requested help," and "was never actually discipline[d] for the late submission of a Form 3996."  (Atencio Aff. ¶ 89; Atencio Dep. at 197.)

Atencio submitted a third medical note dated March 15, 2012 that further restricted her from pushing or pulling in excess of five pounds.  (Lira Aff. Ex. 3: 3/15/12 Letter.)  As a result, on March 20, 2012, Atencio was given a revised limited duty offer that still required her "to case mail for 5 hours and deliver mail for 3 hours," but restricted her to "lifting not more than 5 pounds (8 hours)."  (USPS & Atencio Rule 56.1 Stmts. ¶ 11; Tarczynska Aff. Ex. H: 3/20/12 Offer; Atencio Dep. at 177.)   The assignment further warned Atencio "not to exceed these restrictions."  (Tarczynska Aff. Ex. H: 3/20/12 Offer at 2.)

The parties dispute the impact of the March 20, 2012 limited duty offer on Atencio's day-to-day work at USPS: USPS claims that the assignment allowed Atencio: (1) to receive assistance from her coworkers in performing her work; (2) to assist regular carriers rather than being personally responsible for a mail route; (3) on some days be tasked with office work without having to do any mail deliveries; and (4) submit written requests (on Form 3996 or regular paper) for assistance with deliveries to certain floors on her route, which USPS granted.  (USPS Rule 56.1 Stmt. ¶¶ 12-13; see also Towns Aff. ¶¶ 7-8; Atencio Dep. at 208-09.)  Atencio, however, claims that the offer made no mention of her left shoulder limitation or her pushing and pulling limitation, and that in practice the offer did little to accommodate her limitations.  (Atencio Aff. ¶¶ 81-82.) According to Atencio, these failings reflect USPS's unwillingness to engage in an interactive process to determine an effective accommodation.  She states that:

> At no time since October 18, 2011, has anyone from the postal service ever even attempted to discuss the nature and extent of my limitations, or attempted to elicit from me suggestions as to modifications that might aid me in the performance of my duties as a carrier.  There has never been any type of discussion that could have led to the formulation of a plan that could have dealt with my limitations on something more than an ad hoc basis.

(Atencio Aff. ¶ 8.)  Atencio claims that her managers "refused or rejected any effort or suggestion" to restructure her job to allow her to perform her duties more effectively.  (Atencio Aff. ¶ 5.)

Atencio states that the assistance USPS offered sometimes was delayed or denied entirely, or accompanied by abuse and threats from her supervisors for having made the request.  (Atencio Rule 56.1 Stmt. ¶¶ 12-13; see, e.g., Atencio Aff. ¶¶ 8, 13-14, 41-42, 46, 53, 56-57, 68, 89-91.)  In approximately 2002, Atencio began to develop back problems and "not infrequently requested help of one kind or another on an informal basis, and . . . generally had few problems obtaining the help [she] requested before August 2011."  (Atencio Aff. ¶ 4.)  Atencio's "difficulties

began," however, after her August 2011 injury and return to work in October 2011. (Atencio Aff.

¶ 4.)  Atencio describes the alleged abuse as follows:

> I have mentioned "abuse" and "provocation" . . . .  I had best explain what I
> mean by the terms.  The abuse and provocation most often came up when I requested
> help, not always, but frequently.  When I asked for help, I generally had to ask a
> supervisor for help.  If I asked a carrier (or another co-worker) for help directly, the
> supervisors would have considered me disrupting the work of the other worker,
> something which could have gotten me into trouble.  As a result, I often had to leave
> my route case to find a supervisor to request help.  My leaving my case alone often
> elicited the displeasure of a supervisor.  When I found a supervisor, and made my
> request for help, they often became visibly annoyed with me, and would start yelling
> at me, often coming close to me and invading my personal space while doing so.
> They would not just yell at me; they would literally scream at me.  In other words,
> they frequently would speak to me in a very loud, very intimidating and very abusive
> manner.  The things they would say to me included: "You're lazy."  "You're
> useless."  "You're wasting my time."  "You shouldn't be here."  "Get back to your
> route."  "Wait at your route."  "I hear you."  "Don't come back here."  If I reminded
> them of my limitations, they would call my claim of limitation "bullshit."  They
> would say I was "a fake."  If they intended to deny me assistance, they would say,
> "You're a carrier.  You have to get it done."  "If you can't do the work, go home."
>
> This behavior by supervisors most often occurred in an open area.  As a
> result, everyone in the space heard it.  When a supervisor was screaming at me, most
> likely all of the other route carriers heard it, and most of the other carriers, including
> handlers and drivers.  This was a source of embarrassment to me, particularly when
> my co-workers subsequently made comments about my encounters with supervisors.

(Atencio Aff. ¶¶ 54-55.)  Atencio claims that this treatment caused her to cry "after almost every

workday," and the stress "invariably undermined [her] physical condition" (Atencio Aff. ¶ 57) and

reflected a "pattern" of behavior by her supervisors (Atencio Aff. ¶ 14).  Although Atencio testified

that she had "many supervisors" at Grand Central Station, she could only remember being

supervised by Towns, Buono and Mr. Campagnola.  (Atencio Dep. at 86, 178, 193, 200-01; Atencio

Aff. ¶¶ 13, 91-93; see also Buono Aff. ¶¶ 1, 3; Towns Aff. ¶¶ 1, 3.)

On October 23, 2012, Towns issued Atencio a warning letter for an incident on

October 4, 2012 when Atencio failed to deliver all of the mail on her route, and returned to the

station after leaving the undelivered mail at the loading dock of the building at which the deliveries were to be made.  (USPS & Atencio Rule 56.1 Stmts. ¶ 16; Tarczynska Aff. Ex. P: 10/23/12 Letter; Towns Aff. ¶ 10; Atencio Aff. ¶¶ 24-29; Atencio Dep. at 203-06.)  The warning letter states that Atencio asked to have one mail bucket delivered by someone else because the bundles in the bucket were too heavy.  (10/23/12 Letter at 1.)  Towns, however, informed Atencio that she "would not be receiving any assistance for delivery and [that she] had to deliver the whole route" herself; Towns suggested that Atencio re-bundle the mail into smaller packages to accommodate her weight restrictions.  (Id.; see Towns Aff. ¶ 10.)

Atencio claims that the October 4, 2012 incident was caused by USPS's desire to make it "more difficult to perform the duties of [her] position, and sought to provoke a reaction from [her] that would result in disciplinary action."  (Atencio Aff. ¶ 24.)  The assignment required her to sort, bundle and box one route, and deliver to another.  (Id.)  Atencio had to re-bundle and re-box two or three of the mail containers for her delivery route to accommodate her weight restrictions. (Atencio Aff. ¶ 25.)  Because of the time it took her to re-box the mail, Atencio "had only about 1.5 hours to deliver the route, when [she] normally had about three hours to complete this function." (Id.)  When Atencio finished re-boxing the mail she realized that she would not have enough time to complete delivery, and twice asked for help in the form of additional personnel or permission to work overtime, which was refused.  (Atencio Aff. ¶¶ 27, 29.)  Atencio was denied help a third time while on the route.  (Atencio Aff. ¶ 29.)  Moreover, Atencio's request to have additional tubs of mail delivered by a driver to the route's high volume customers was denied, even though Atencio claims that such a request is "standard procedure" at USPS.  (Atencio Aff. ¶ 26.)

Atencio believes that if her supervisors had a choice of more than one route to assign her, they selected the route with the higher volume of mail because of her limitations.  (Atencio Aff.

¶ 22.)  Towns and Buono claim that route assignments were solely motivated by an assessment of the needs of the office, and took into account the physical restrictions of USPS employees, including Atencio.  (Buono Aff. ¶ 4; Towns Aff. ¶¶ 8-9.)

On January 8, 2013, Towns asked Atencio to collect hand-held mail scanners and transport them using a push cart.  (USPS & Atencio Rule 56.1 Stmts. ¶ 17; Atencio Aff. ¶ 92.) Atencio was "'very happy'" to be assigned this task.  (USPS & Atencio Rule 56.1 Stmts. ¶ 17; Atencio Dep. at 214.)  While collecting the scanners, Atencio noticed that she was having difficulty pushing the cart because a wheel was broken.  (Atencio Aff. ¶ 92; Atencio Dep. at 215-16, 219.) Atencio reported the issue to Towns and asked to use a different cart, but Towns ordered Atencio to complete the task with the defective cart.  (Atencio Aff. ¶ 92; Atencio Dep. at 216-17, 219-20.) Atencio claims that shortly thereafter she injured her back while pushing the cart; Towns allowed Atencio to rest in the locker room for the remainder of the day.  (USPS & Atencio Rule 56.1 Stmts. ¶ 18; Atencio Aff. ¶ 93; Atencio Dep. at 217-18, 220-21.)  Atencio reported to work on January 9 and 10, 2013, but was unable to work due to pain.  (Atencio Aff. ¶ 93; Atencio Dep. at 221-22.) Atencio filed for workers' compensation benefits and has not worked in any capacity since January 10, 2013.  (USPS & Atencio Rule 56.1 Stmts. ¶ 19; Atencio Aff. ¶ 96.)

**Atencio's Limitations and Proposed Accommodations**

Atencio is subject to lifting restrictions (see pages 3-5 above), but disputes that heavy lifting is an essential function of her position.  (Atencio Aff. ¶ 35.)  She nevertheless "admit[s] that, as the jobs are currently structured, regular and T-6 carriers will almost invariably encounter situations requiring the lifting [of] something fairly heavy during every workday," and that "most regular carriers and T-6 carriers probably do engage in intermittent heavy lifting as a relatively small part of their workdays, every day."  (Id.)  In any event, this function, she argues, could be performed

by other USPS employees as needed.  (<u>See</u>, <u>e.g.</u>, Atencio Aff. ¶¶ 35, 38, 46, 49, 52.)

Atencio "believe[s] that sorting is an essential function of a regular or T-6 carrier." (Atencio Aff. ¶ 50.)  Some of the case slots, however, were located above shoulder level which made sorting difficult for Atencio given her left arm restrictions.  (Atencio Aff. ¶ 51; <u>see</u> pages 3-4 above.)  Atencio accommodated this issue by placing the mail for the higher slots in piles on the case ledge, or setting up a separate container just for those customers.  (<u>Id.</u>)  She states that the cases could be modified easily to eliminate any overhead reaching.  (<u>Id.</u>)

The sorting process also involves moving containers of mail from a cart or the floor to the case ledge.  (Atencio Aff. ¶ 52.) Atencio "ha[s] to admit that moving a tray or tub of mail to the ledge for sorting would involve heavy lifting," and that "it cannot be denied that, as the job of route carrier is currently structured, most route carriers, including me after October 18, 2011, will lift most of the trays and tubs they sort."  (<u>Id.</u>)  But this function, she reiterates, "could just as efficiently be done by anyone" else at USPS.  (<u>Id.</u>)

Before August 2011, after sorting and boxing the mail, Atencio would obtain a flatbed cart, move the tubs of mail onto the cart and push the cart to the post office loading dock.  (Atencio Aff. ¶ 66.)  After October 18, 2011, Atencio generally would follow this same procedure, but could no longer push the weight of a loaded cart and thus a "driver needed to move the cart for [her] from the route case to the loading dock."  (Atencio Aff. ¶ 67.)  Moreover, while heavy lifting was not an issue when loading the carts because all of the tubs to be loaded were within Atencio's weight restrictions, "the repetitive process of lifting one tub at a time and placing the [loaded] tub[s] on the cart was a process that taxed [her] physical abilities."  (Atencio Aff. ¶ 68.)  Complicating this problem was the fact that because Atencio had to limit the weight of each tub due to her weight restrictions, there consequently were more tubs to load.  (<u>Id.</u>)  Atencio accommodated this limitation

by loading the cart with empty containers that she then filled with mail, eliminating the need for any lifting.  (Atencio Aff. ¶ 69.)  USPS supervisors, however, prevented Atencio from placing a cart and empty tubs near her case during the sorting and loading process because it allegedly caused too much congestion among the cases, and other employees needed the cart in the interim.  (Atencio Aff. ¶¶ 69-70.)   Atencio claims that her restrictions in this regard "could have easily been accommodated by having the amount of space around cases increased so that [she] could park a flatbed cart near [her] case during sorting, bundling and boxing without interfering with the work of other carriers.  It would have been a further accommodation to obtain a cart that would be, more or less, for [her] exclusive use."  (Atencio Aff. ¶ 72.)

Atencio believes that a regular or T-6 "carrier's ultimate function" is the "delivery of the mail" (Atencio Aff. ¶ 35), although she encountered further difficulties performing this function (Atencio Aff. ¶¶ 63-64).  Atencio would move the boxed mail to the route using a postal cart, yet eventually found that the carts were too heavy.  (Atencio Aff. ¶¶ 63-64.)  She therefore replaced the postal cart with a luggage cart, to which she would tie one or two mail tubs at a time.  (Atencio Aff. ¶¶ 64-65.)  As described immediately above, however, because of Atencio's weight restrictions she had "many more tubs" than she otherwise would have had, and thus "had to make many more trips between relay points and customer locations."  (Atencio Aff. ¶ 75.)  "These trips involved not only the time and distance between relay and customer, but also waiting for elevators."  (Id.)  The greater number of trips "also increased the probability that [Atencio] might run into some other obstacle to delivery, like a[] stubborn building superintendent or elevator operator, or a large delivery for a construction site upstairs that might make a freight elevator unavailable to [her] for a lengthy period of time."  (Id.)  Before August 2011, in dealing with unforseen delays on a route, Atencio would call for additional personnel to help her or to obtain permission to work overtime.

(Atencio Aff. ¶ 79.)  After October 18, 2011, Atencio was not granted permission to work overtime

but "usually" was given extra help, despite her supervisors' abuse.  (Id.)

Atencio proposes the following accommodations that "probably would have allowed

[her] to deliver routes about as quickly as [she] did when [she] had no limitations":

> The accommodation would include the accommodations mentioned previously with
> respect to the flatbed carts used to move mail to the post office's loading dock.  It
> would also involve the provision of a helper, perhaps a driver, who would deliver,
> as usual, to high volume customers and also to each floor of a building on my route.
> With these accommodations, I would be able to fully load tubs in the boxing process.
> The helper would take the tubs intended for high volume customers, and then take
> the other tubs and deposit them on the intended floor for each tub.  I would follow,
> and deliver the mail for each floor, taking care of the valuables, that is, the Express,
> certified and register mail, along the way.  This accommodation would reduce the
> number of tubs needing delivery, and speed the process of getting mail to each floor
> in that a helper with no limitations would be able to move more tubs and more fully
> load tubs at a time than I could.  I never brought this suggested accommodation to
> the attention of the postal service simply because I just came up with it, but, even if
> I had developed it earlier, the postal service would have never have given me an
> opportunity to convey it to them.

(Atencio Aff. ¶ 77.)  Atencio further testified as follows:

> Q.    So what I am trying to understand is what do you think [USPS] should have
>       done differently?  How should they have accommodated you?
>
> A.    That I would help.  Not might [sic] be one of the principals on the route.  I
>       should have had help, not the other way around.
>
> Q.    What kind of help do you think you should have had?
>
> A.    Say, for example, here is the route, there are the cases there, and there is a
>       principal person putting in the mail.  And I would, for instance, do or give
>       her the mail over there, not by lifting it.  But give it to her with my hands. .
>       . .
>
> Q.    Just so that I understand, you think rather than making you the principal on
>       a route, the postal service should have accommodated you by making you
>       just a helper?  Is that accurate?
>
> A.    Of course.  It would be more convenient.

(Atencio Dep. at 183-84.)   Atencio admits that there is no regular "'helper'" position at USPS. (USPS & Atencio Rule 56.1 Stmts. ¶ 25.)

## ANALYSIS

## I.   LEGAL PRINCIPLES

### A.   General Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed."  Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[2] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which

---

[2]    See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49 (2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

### B.      Additional Summary Judgment Standards In Employment Discrimination Cases

When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a "trial court must be cautious about granting summary judgment." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).[3/]  Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions.  E.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1224.  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory

---

[3/]      Accord, e.g., Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); Cardozo v. Healthfirst, Inc., 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).

allegations of discrimination or retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer.  E.g., Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Stern v. Trs. of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[4/]  Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'"  Weinstock v. Columbia Univ., 224 F.3d at

---

[4/]    See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652 (2d Cir. 1997).

41.

**C.**     <u>**Legal Standards Under the Rehabilitation Act**</u>

"Section 501 of the Rehabilitation Act establishes a program within the federal government to encourage the employment of individuals with disabilities, and applies to '[e]ach department, agency, and instrumentality (including the United States Postal Service and the Postal Rate Commission) in the executive branch.'"  <u>Rivera</u> v. <u>Heyman</u>, 157 F.3d 101, 103 (2d Cir. 1998) (emphasis omitted) (quoting 29 U.S.C. § 791(b)); <u>see also</u> <u>Atencio</u> v. <u>U.S. Postal Serv.</u>, 14 Civ. 7929, 2015 WL 7308664 at *6 (S.D.N.Y. Nov. 19, 2015).  The Rehabilitation Act provides the sole means by which a federal employee may raise an employment discrimination claim on the basis of disability.  <u>Rivera</u> v. <u>Heyman</u>, 157 F.3d at 103 ("As a federal employee, [plaintiff] has no remedy for employment discrimination under the ADA.  His sole claim for discrimination on the basis of disability is under the Rehabilitation Act, if anywhere." (citation omitted)); <u>see also</u>, <u>e.g.</u>, <u>Atencio</u> v. <u>U.S. Postal Serv.</u>, 2015 WL 7308664 at *5 (dismissing Atencio's ADA claims in this case); <u>Carby</u> v. <u>Holder</u>, 11 Civ. 5775, 2013 WL 3481722 at *8 n.9 (S.D.N.Y. July 10, 2013) ("In the Second Circuit, Section 501 of the Rehabilitation Act provides the exclusive route by which federal employees may raise claims of employment discrimination on the basis of disability.").

Rehabilitation Act claims generally are analyzed using the same standards that govern ADA claims.  <u>E.g.</u>, <u>Dean</u> v. <u>Univ. at Buffalo Sch. of Med. & Biomedical Scis.</u>, 804 F.3d 178, 187 (2d Cir. 2015); <u>Atencio</u> v. <u>U.S. Postal Serv.</u>, 2015 WL 7308664 at *6.[5/]   Employment

_____

[5/]     <u>See also</u>, <u>e.g.</u>, <u>Davis</u> v. <u>Shah</u>, --- F.3d ----, 2016 WL 1138768 at *22 (2d Cir. Mar. 24, 2016); <u>Allen</u> v. <u>N.Y.C. Hous. Auth.</u>,15 Civ. 00173, 2016 WL 722186 at *6 (S.D.N.Y. Feb. 19, 2016); <u>Jones</u> v. <u>Ng</u>, 14 Civ. 1350, 2015 WL 998467 at *9 (S.D.N.Y. Mar. 5, 2015) (Peck, M.J.); 29 U.S.C. § 791(f) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this
(continued...)

18

discrimination claims under the Rehabilitation Act are analyzed using the burden-shifting

framework established by the established by the Supreme Court in <u>McDonnell Douglas Corp.</u> v.

<u>Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  <u>McBride</u> v. <u>BIC Consumer Prods. Mfg. Co.</u>,

583 F.3d 92, 96 (2d Cir. 2009); <u>see also</u>, <u>e.g.</u>, <u>Doe</u> v. <u>Bd. of Educ. of Fallsburgh Cent. Sch. Dist.</u>,

63 F. App'x 46, 48 (2d Cir. 2003); <u>Bruzzese</u> v. <u>Lynch</u>, No. 13-CV-5733, 2016 WL 3220986 at *5

(E.D.N.Y. June 8, 2016) (Weinstein, D.J.).

## II.   USPS IS GRANTED SUMMARY JUDGMENT ON ATENCIO'S CLAIM FOR FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS

### A.   Failure to Accommodate Generally

An employer violates "the Rehabilitation Act when it fails to 'mak[e] reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an applicant or employee,' unless the employer can establish that the

accommodations would 'impose an undue hardship.'"  <u>Jackan</u> v. <u>N.Y.S. Dep't of Labor</u>, 205 F.3d

562, 566 (2d Cir.), <u>cert. denied</u>, 531 U.S. 931, 121 S. Ct. 314 (2000); <u>see also</u>, <u>e.g.</u>, 42 U.S.C. §§

12112(a), 12112(b)(5)(A).  To establish a claim for failure to accommodate, an employee must show

that: "(1) [she] is a person with a disability under the meaning of the [Rehabilitation Act]; (2) an

employer covered by the statute had notice of h[er] disability; (3) with reasonable accommodation,

[the employee] could perform the essential functions of the job at issue; and (4) the employer has

refused to make such accommodations."  <u>Noll</u> v. <u>I.B.M. Corp.</u>, 787 F.3d 89, 94 (2d Cir. 2015)

(quotations omitted); <u>accord</u>, <u>e.g.</u>, <u>Atencio</u> v. <u>U.S. Postal Serv.</u>, 14 Civ. 7929, 2015 WL 7308664

---

<sup>5/</sup>       (...continued)
        section shall be the standards applied under . . . the Americans with Disabilities Act . . . as
        such sections relate to employment.").

at *6 (S.D.N.Y. Nov. 19, 2015).

A "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); see also, e.g., 29 C.F.R. § 1630.2(m); Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99-100 (2d Cir. 2003). The "essential functions" of a position "means the fundamental job duties of the employment position," but not "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). In determining whether a particular function is essential, courts consider, among other things, "[t]he employer's judgment as to which functions are essential," "[w]ritten job descriptions," and "[t]he amount of time spent on the job performing the function." 29 C.F.R. § 1630.2(n)(3). "A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." D'Amico v. City of N.Y., 132 F.3d 145, 151 (2d Cir.), cert. denied, 524 U.S. 911, 118 S. Ct. 2075 (1998); see also, e.g., 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."). "But ultimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004).

A "reasonable accommodation" is a modification "to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable[s] an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). A reasonable accommodation can be achieved in a variety of ways, see 29 C.F.R. § 1630.2(o)(2), and "employers are not required to provide a perfect

accommodation or the very accommodation most strongly preferred by the employee," as long as the chosen accommodation is effective.  Noll v. I.B.M. Corp., 787 F.3d at 95.[6]

"A reasonable accommodation can never involve the elimination of an essential function of a job," Shannon v. N.Y.C. Transit Auth., 332 F.3d at 100, or result in a promotion to a position for which the employee is unqualified, McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 98 (2d Cir. 2009).  See also, e.g., 29 C.F.R. § 1630.2(m) (employee must satisfy "the requisite skill, experience, education and other job-related requirements of the employment position"); 29 C.F.R. § 1630 App'x ("an employer is not required to promote an individual with a disability as an accommodation").  Nor is the employer required to create a new position as an accommodation.  Graves v. Finch Pruyn & Co., 457 F.3d 181, 187 (2d Cir. 2006); see also, e.g., Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999) ("[A]n employer need not reassign an employee if no position is vacant.  Nor is the employer obliged to create a new position to accommodate the employee." (citation omitted)).  Even when presented with a plausible accommodation, an employer may avoid liability under the Act if it can demonstrate that the accommodation would cause an undue hardship.  McMillan v. City of N.Y., 711 F.3d 120, 128 (2d Cir. 2013).  The "term 'undue hardship' means an action requiring significant difficulty or expense" considering, among other factors, the "nature and cost of the accommodation" and the "overall financial resources" of the employer.  42 U.S.C. § 12111(10)(A)-(B).

### B.  Determining a Reasonable Accommodation

Generally, "'it is the responsibility of the individual with a disability to inform the

---

[6]   See also, e.g., 29 C.F.R. § 1630.9(d); 29 C.F.R. § 1630 App'x (where multiple reasonable accommodations are identified, "the preference of the individual with a disability should be given primary consideration . . .[, although] the employer providing the accommodation has the ultimate discretion to choose between effective accommodations . . . .").

employer that an accommodation is needed.'" Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006); see, e.g., Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008) ("We therefore hold that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious-which is to say, if the employer knew or reasonably should have known that the employee was disabled."). To help achieve compliance with the Act, an informal "'interactive process'" is contemplated "by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Jackan v. N.Y.S. Dep't of Labor, 205 F.3d 562, 566 (2d Cir.), cert. denied, 531 U.S. 931, 121 S. Ct. 314 (2000). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

Despite the employee's initial responsibility to inform her employer of the need for an accommodation, the regulations "impose an obligation upon an employer to take affirmative steps to assist an employee in identifying potential accommodations." Jackan v. N.Y.S. Dep't of Labor, 205 F.3d at 568 n.4. But an employer's failure to do so will not provide the basis for a claim under the Act "and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 101 (2d Cir. 2009); see also, e.g., Snowden v. Trs. of Columbia Univ., 612 F. App'x 7, 9-10 (2d Cir. 2015). As a corollary, where an employer has provided a "plainly reasonable" accommodation, "the [Act] imposes no liability for an employer's failure to explore alternative accommodations" because "the interactive process is not required when the end it is designed to serve–reasonable accommodation–has already been achieved." Noll v. Int'l Bus. Mach. Corp., 787 F.3d 89, 98 (2d Cir. 2015).

"The plaintiff bears the burdens of both production and persuasion as to the existence

of some accommodation that would allow her to perform the essential functions of her employment, including[, if applicable,] the existence of a vacant position for which she is qualified."  McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d at 97.  "The burden of persuasion on the 'existence' of an 'effective accommodation' is not satisfied by mere speculation."  Jackan v. N.Y.S. Dep't of Labor, 205 F.3d at 566.  "By contrast, with regard to the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits.  The burden of persuasion falls on the defendant employer."  McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d at 97 n.3.

### C.    Atencio Has Not Proven That a Reasonable Accommodation Exists

Atencio claims that USPS never attempted to discuss her limitations, and rejected any job modifications that she suggested.  (See page 6 above.)  For USPS's alleged failure to engage in an interactive process to be actionable, Atencio bears the burden of production and persuasion that a reasonable accommodation exists that would allow her to perform the essential functions of a T-6 carrier.  (See pages 21-22 above.)  USPS argues that Atencio is not qualified for the T-6 carrier position, and that her proposed accommodations are unreasonable as a matter of law.  (Dkt. No. 69: USPS Br. at 9-19.)[2/]  The Court accordingly must determine whether Atencio is "qualified" for her position within the meaning of the Act.  (See pages 18-19 above.)

A reasonable accommodation can be achieved in any number of ways (see pages 19-20 above) including through "job restructuring" and "the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. §

---

[2/]    USPS makes no argument that it is not subject to the Rehabilitation Act or that it did not have notice of Atencio's alleged disability, and concedes, for purposes of this motion, that Atencio is disabled within the meaning of the Act.  (USPS Br. at 11.)

12111(9)(B).  The Act contemplates that the provision of additional personnel to assist a disabled

individual in the performance of his or her duties might be reasonable in some situations.  For

example, providing "personal assistants, such as a page turner for an employee with no hands or a

travel attendant to act as a sighted guide to assist a blind employee on occasional business trips, may

. . . be a reasonable accommodation."  29 C.F.R. § 1630 App'x.  A reasonable accommodation

allows the employee, not someone else, to perform the position's essential functions.

> In the case of a blind employee who requires a reader, for example, the relevant
function is "not the ability to read per se, but rather the ability to take in, process, and act on
information.  The provision of a reader in these circumstances does not eliminate an essential
function, but rather permits the individual with a disability to perform that essential function."
Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 140-41 (2d Cir. 1995).  In contrast, an employer
"is not required to reallocate essential functions":

> > For example, suppose a security guard position requires the individual who holds the
job to inspect identification cards.  An employer would not have to provide an
individual who is legally blind with an assistant to look at the identification cards for
the legally blind employee.  In this situation the assistant would be performing the
job for the individual with a disability rather than assisting the individual to perform
the job.

29 C.F.R. § 1630 App'x.  Providing an assistant to a disabled employee may result in the creation

of a new position, or the reallocation or elimination of a job's essential functions, which the

Rehabilitation Act does not require.  See, e.g., Luckiewicz v. Potter, 670 F. Supp. 2d 400, 409 (E.D.

Pa. 2009) ("Furthermore, '[a]n employer's obligation to provide a reasonable accommodation does

not require the employer to create a new job.'"); Carter v. Potter, No. 06-CV-3854, 2008 WL

1848639 at *6 (E.D.N.Y. Apr. 23, 2008) (Plaintiff "complains that the Postal Service failed to assign

her to entirely different jobs performing different functions . . . .  [T]his accommodation would do

away with [plaintiff's] duties entirely and assign her completely different duties."); Lipka v. Potter,

No. 03CV381A, 2006 WL 839421 at *7 (W.D.N.Y. Mar. 28, 2006).[8/]

Here, most of the accommodations that Atencio proffers involve the provision of an

assistant throughout her work day.  (See page 12 above.)  The assistant would help Atencio move

the mail containers from the floor or mail cart to the case ledge, and push the loaded flatbed cart to

the postal service loading dock.  (See page 12 above; Dkt. No. 77: Atencio Br. at 18.)  A USPS

driver would then handle Atencio's "tubs of regular mail in a way similar to the way mail drivers

currently handle mail for high volume customers on all routes."  (Atencio Br. at 19; see page 12

above.)  In particular, "the mail driver would go a bit beyond delivering boxed mail to a relay in a

building lobby or loading dock.  Instead, the driver would deliver the tubs to their intended floors.

At each floor, the plaintiff would then deliver the mail bundles to their intended recipients."

(Atencio Br. at 19; see page 12 above.)

The Court assumes, without deciding, that the use of an assistant to perform some

of Atencio's non-essential job functions, such as pushing the flatbed cart to the loading dock, could

allow Atencio to perform some of the essential functions of the T-6 position, rather than eliminating

---

[8/]      See also, e.g., Borkowski v. Valley Cent. Sch. Dist., 63 F.3d at 140-41 ("Admittedly, then,
          having someone else do part of a job may sometimes mean eliminating the essential
          functions of the job."); Reddick v. Yale Univ., 2015 WL 7428525 at *7 (D. Conn. Nov. 20,
          2015) ("Courts have not considered as reasonable an accommodation that the employer hire
          an additional employee or reassign tasks to other employees" that would eliminate an
          essential function of the position); Hunt-Watts v. Nassau Health Care Corp., 43 F. Supp. 3d
          119, 134 (E.D.N.Y. 2014) ("Plaintiff's proposed accommodation is also not reasonable
          because it amounts to having other employees do her job for her, and would result in
          Defendant having to employ two professionals to perform the job of one podiatrist."), appeal
          withdrawn, (Jan. 22, 2015); Adams v. Rochester Gen. Hosp., 977 F. Supp. 226, 235
          (W.D.N.Y. 1997) ("Given [plaintiff's] string of errors, requiring [the employer] to hire an
          employee just to review and oversee [plaintiff's] work would not be a reasonable
          accommodation.").

those functions.[9]  Enlisting an assistant to follow Atencio with the mail, floor by floor into each building on her route, however, is not a reasonable accommodation as a matter of law.  Such an accommodation would eliminate what Atencio herself deems the "ultimate function" of a T-6 carrier: delivery of the mail.  (See page 11 above; see also Atencio Aff. ¶ 33 ("As a regular carrier or a T-6 carrier, my basic function is to deliver mail from a particular post office to postal customers on a defined route.").)  Atencio's proposed accommodation does not involve assistance with a peripheral aspect of the delivery process that facilitates her performance of the underlying task; rather, physically bringing the mail containers to each floor of the buildings on Atencio's route is an indivisible part of mail delivery, after which it only remains to hand the mail to each customer. See, e.g., Luckiewicz v. Potter, 670 F. Supp. 2d at 409 ("'[O]ne of the essential functions of a mail carrier is to physically deliver the mail to the people along the route.'").  Therefore, because Atencio's suggested accommodation would result in the reallocation of an essential function of a T-6 carrier, USPS is entitled to summary judgment on Atencio's claim for failure to engage in an interactive process to accommodate her disability.

---

[9]     The Court notes, however, that contrary to Atencio's arguments (see page 9 above), several courts have found that heavy lifting is itself an essential function of a postal worker position. See, e.g., Lambert v. Donahoe, No. 09-CV-01212, 2011 WL 4730536 at *3 (S.D. Ind. Oct. 7, 2011) (Plaintiff employee "admits that because of her persistent injury and consequent medical restrictions, she 'could not do the heavy lifting' required of a mail handler. [Plaintiff] claims neither that a reasonable accommodation existed that would allow her to return to that original position nor that the USPS denied her such an accommodation."); Bassett v. Potter, No. 07-1172, 2010 WL 914412 at *3 (C.D. Ill. Mar. 10, 2010) ("[T]he essential functions of a mail carrier include a number of physical activities, such as being able to lift 70 pounds, reach above the shoulders, use the fingers, stand or walk for 8-10 hours, bend and climb . . . ."); Bunis v. Runyon, 92 Civ. 6577, 1994 WL 445722 at *4 (S.D.N.Y. Aug. 17, 1994) ("[P]laintiff has been restricted from pushing, pulling, or lifting anything over ten pounds with her right hand . . . .  Letter carriers are required to lift, pull and box mail over ten pounds.  In fact, letter carriers are required to be able to move packages up to 70 pounds.  Eliminating these requirements is unreasonable." (record citations omitted)), aff'd, 60 F.3d 810 (2d Cir. 1995).

　　　　　While USPS on occasion permitted other employees to deliver the mail on Atencio's route as an accommodation of her disability (see page 5 above), providing an accommodation that goes above and beyond what the Act requires does not subject an employer to liability when it discontinues such accommodation, or constitute an admission that the accommodation is reasonable as defined by the Act.  See, e.g., Graves v. Finch Pruyn & Co., 457 F.3d 181, 187 (2d Cir. 2006) (Plaintiff "concedes that the sedentary position he desired was created at his request . . . .  Given that the ADA does not require creating a new position for [plaintiff] at all, we fail to see how it can dictate the duration of a new position that his employer created for him as a matter of grace.  We hold that the ADA did not require [defendant employer] to give [plaintiff] this new position for any longer than it did."); Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001) ("[W]e agree with the Seventh Circuit that evidence that accommodations were made so that an employee could avoid a particular task 'merely shows the job could be restructured, not that [the function] was non-essential.'  To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers.  In short, even though her co-workers had allowed [plaintiff] to avoid having to lift more than fifty pounds, the ability to do so remained an essential function of her position." (citations omitted)).[10/]

　　　　　These principles have been applied by various courts to postal workers in analogous contexts, and the Court does so here.  See, e.g., Ozlowski v. Henderson, 237 F.3d 837, 841 (7th Cir.

---

[10/]　　　　See also, e.g., Mineweaser v. City of N. Tonawanda, No. 14-CV-00144, 2016 WL 3352046 at *10 (W.D.N.Y. Mar. 21, 2016), R. & R. adopted, 2016 WL 3279574 (W.D.N.Y. June 15, 2016); Palmieri v. City of Hartford, 947 F. Supp. 2d 187, 203 (D. Conn. 2013) ("In other words, simply because [plaintiff] was given light duty does not alter the essential functions of his job as a patrol officer."); Uhl v. Home Depot U.S.A., Inc., No. 08-CV-3064, 2010 WL 3282611 at *5 (E.D.N.Y. Aug. 13, 2010) (Employer's "prior, voluntary effort to accommodate [plaintiff] in excess of its legal obligations is admirable.  But it does not compel [the employer] to continue to accommodate him beyond what the law requires.")

2001) ("Even if the Postal Service made an accommodation to a previous employee by assigning her a helper to essentially perform her job, the Postal Service was not required to do so for her and likewise was not required to do so for [plaintiff]."); Lambert v. Donahoe, 2011 WL 4730536 at *4 ("The USPS has no obligation to place [plaintiff employee] i[n] a permanent limited-duty position."); Luckiewicz v. Potter, 670 F. Supp. 2d at 408 ("The fact that Plaintiff was able to perform his responsibilities in the Limited Duty Program, and the fact that the USPS allowed him to perform those duties for several years, does not make Plaintiff a 'qualified individual' under the Rehabilitation Act."); Trobia v. Henderson, 315 F. Supp. 2d 322, 331 (W.D.N.Y. 2004) ("The fact that the USPS allowed plaintiff to work in the Box Section . . . without performing certain functions . . . does not mean that these functions were not essential functions of the job within the meaning of the Act."), aff'd, 143 F. App'x 374 (2d Cir. 2005); Alenski v. Potter, No. CV-03-2179, 2005 WL 1309043 at *16 (E.D.N.Y. May 18, 2005).[11/]

## III.   USPS IS NOT ENTITLED TO SUMMARY JUDGMENT ON ATENCIO'S RETALIATORY HARASSMENT CLAIM

Atencio claims that USPS subjected her to a retaliatory hostile work environment because she requested help to address her limitations.  (Dkt. No. 77: Atencio Br. at 19-21.)

It is unlawful under the ADA (and consequently the Rehabilitation Act) for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter."  42 U.S.C. § 12203(b); see also, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 222 (2d Cir. 2001).  "Claims for retaliation [under the ADA and the

---

[11/]   Given the Court's holding, it need not address USPS's argument that the accommodation it provided satisfied its obligations under the Act.  (USPS Br. at 16-19.)

Rehabilitation Act] are analyzed under the same burden-shifting framework established for Title VII cases." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); see also, e.g., Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 223; Atencio v. U.S. Postal Serv., 14 Civ. 7929, 2015 WL 7308664 at *7 (S.D.N.Y. Nov. 19, 2015).

       To establish a prima facie retaliation case, the plaintiff must adduce "'evidence sufficient to permit a rational trier of fact to find [1] that she engaged in protected participation or opposition under [the ADA or Rehabilitation Act], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action.'" Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 223; see also, e.g., EEOC v. Day & Zimmerman NPS, Inc., No. 15-CV-01416, 2016 WL 1449543 at *3 (D. Conn. Apr. 12, 2016); Atencio v. U.S. Postal Serv., 2015 WL 7308664 at *7.[12/] "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit

------

[12/]       "There is an open question in the Second Circuit on which causal theory courts should apply when evaluating whether discrimination or retaliation [under the ADA] constitutes the 'real reason' for the adverse action."  Eisner v. City of N.Y., 15 Civ. 1888, 2016 WL 828126 at *5 (S.D.N.Y. Feb. 22, 2016); see also, e.g., Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 586 F. App'x 739, 745 n.3 (2d Cir. 2014) ("This 'but-for' standard might also apply to her ADA retaliation claim."); Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 436 (E.D.N.Y. 2015); Sherman v. Cty. of Suffolk, 71 F. Supp. 3d 332, 347-50 (E.D.N.Y. 2014).  But-for causation does not "require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.  Further, the but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 91 (2d Cir. 2015) (citation & quotations omitted).  The result would not differ on this motion regardless of which causation standard applies.

a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" Treglia v. Town of Manlius, 313 F.3d at 721.

Seeking a reasonable accommodation of a disability is a protected activity under the ADA and Rehabilitation Act. Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d at 149; see also, e.g., Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2014 WL 808013 at *9 (E.D.N.Y. Feb. 28, 2014) ("The Second Circuit and district courts in this Circuit have also allowed retaliation claims based on a request for reasonable accommodation."); Rodriguez v. Atria Senior Living Grp., Inc., 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012) ("Requesting a reasonable accommodation of a disability is an ADA-protected activity."); Conley v. United Parcel Serv., 88 F. Supp. 2d 16, 20 (E.D.N.Y. 2000) ("Several courts have held that a non-disabled employee is nonetheless protected against retaliation if the employee made a good faith request for a reasonable accommodation.").

Causation between the protected activity and the adverse action "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409 (2006)); see also, e.g., Platt v. Inc. Vill. of Southampton, 391 F. App'x 62, 64 (2d Cir. 2010); Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 90 (2d Cir. 2010); Atencio v. U.S. Postal Serv., 2015 WL 7308664 at *8; Lewis v.

Boehringer Ingelheim Pharm., Inc., 79 F. Supp. 3d 394, 413 (D. Conn. 2015).  "'To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII [or the Rehabilitation Act], a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his employment.'"  Villar v. City of N.Y., 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015); see also, e.g., Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999) ("We adopt the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case."), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405; Gomez v. N.Y.C. Police Dep't, 15 Civ. 4036, 2016 WL 3212108 at *5 (S.D.N.Y. June 7, 2016) ("Hostile work environment claims under the ADA, which 'are evaluated under the same standards as hostile work environment claims under Title VII,' arise '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (citations omitted).[13]

A hostile work environment claim requires a showing that "(1) 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or

---

[13]    USPS does not dispute the viability of a hostile work environment claim under the Rehabilitation Act in this Circuit.  (USPS Br. at 19; Dkt. No. 80: USPS Reply Br. at 8-9.)  See, e.g., Hinz v. Vill. of Perry, No. 15-2239-CV, 2016 WL 3435265 at *1 (2d Cir. June 20, 2016) ("This Court has 'not yet decided whether a hostile work environment claim is cognizable under the ADA.'"); Preston v. Bristol Hosp., No. 15-1150, 2016 WL 1253872 at *2 n.3 (2d Cir. Mar. 31, 2016) ("We assume that a hostile work environment claim is cognizable under the ADA."); Flieger v. E. Suffolk Boces, No. 13-CV-6282, 2016 WL 3527519 at *18 (E.D.N.Y. June 23, 2016).

pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" Lekettey v. City of N.Y., No. 15-1169, --- F. App'x ----, 2016 WL 482109 at *2 (2d Cir. Feb. 8, 2016) (quoting Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000)).  "'This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'" Littlejohn v. City of N.Y.,795 F.3d 297, 321 (2d Cir. 2015).  "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).

The hostility of a work environment is assessed considering the "totality of the circumstances." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (quotations omitted); see also, e.g., Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.  To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." (citation & quotations omitted)).  "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.'" Torres v. Pisano, 116 F.3d 625, 631 (2d Cir.), cert. denied, 522 U.S. 997, 118 S. Ct. 563 (1997).

Isolated incidents of discriminatory comments or conduct are not sufficient to establish a hostile work environment.  E.g., Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118

S. Ct. 2275, 2283 (1998) ("'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) ("'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII" (citation omitted)); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) ("Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' Generally, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (citations omitted)); Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").[14/] "Among the factors [the courts] consider are 'the frequency

---

[14/]   See also, e.g., Byrne v. Telesector Res. Grp., Inc., 339 F. App'x 13, 18 (2d Cir. 2009) (isolated incidents of offensive misconduct "do not rise to a sufficiently serious level to manifest a work environment 'permeated with discriminatory intimidation'"); DeSalvo v. Volhard, 312 F. App'x 394, 397 (2d Cir.), cert. denied, 130 S. Ct. 70 (2009); Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) ("'As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."'"); Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) ("'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"); Rizzo-Puccio v. Coll. Auxiliary Servs., Inc., No. 99-9272, 216 F.3d 1073 (table), 2000 WL 777955 at *3 (2d Cir. June 14, 2000) ("[I]solated remarks or occasional episodes of harassment do not constitute a hostile environment within the meaning of Title VII."); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) ("As a general matter, 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.'"), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002); Slaitane v. Sbarro, Inc., 03 Civ. 5503-04, 2004 WL 1202315 at *13 (S.D.N.Y. June 2, 2004) (Peck, M.J.); Diaz v. Weill Med. Ctr. of Cornell Univ., 02 Civ. 7380, 2004 WL 285947 at *18 (S.D.N.Y. Feb. 13, 2004) (continued...)

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" Feingold v. New York, 366 F.3d at 150 (quoting Harris v. Forklift Sys., Inc., 510 U.S. at 23, 114 S. Ct. at 371).[15/]

       Atencio has satisfied the first, second and fourth prongs of her prima facie case. Atencio alleges that she sustained a back injury in approximately 2002, and that until August 2011 she encountered few difficulties with her supervisors, who generally made a good faith effort to provide her assistance when needed.  (See pages 6-7 above.)  Once Atencio sought a formal accommodation in October 2011, however, she claims that her supervisors would "abuse and provo[ke]" her, most often when she requested assistance.  (See page 7 above.)  Atencio's supervisors allegedly referred to her as "useless," "lazy" and a "fake," and called her claim of limitation "bullshit" in an open area among other USPS employees.  (See page 7 above.)  Although Atencio admittedly is vague in her description of the offending "supervisors," the record reflects that Towns and Buono supervised Atencio during the relevant time period, and, drawing all reasonable inferences in favor of the non-moving party, they each had the ability to take tangible employment actions against Atencio.  See Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113-14 (2d Cir. 2015);

---

[14/]     (...continued)
(Peck, M.J.) (& cases cited therein), aff'd, 138 F. App'x 362 (2d Cir. 2005).

[15/]     Accord, e.g., Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 82 (2d Cir. 2009); Patane v. Clark, 508 F.3d at 113; Demoret v. Zegarelli,  451 F.3d at 149-50; Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003); Slaitane v. Sbarro, Inc., 2004 WL 1202315 at *13; see also, e.g., Clemente v. N.Y.S. Div. of Parole, 01 Civ. 3945, 2004 WL 1900330 at *12 (S.D.N.Y. Aug. 24, 2004) ("As for pervasiveness, the Court concludes that six occurrences of relatively mild workplace difficulty over the course of a year do not, as a matter of law, constitute 'pervasive' harassment.").

see pages 4, 7-8 above.  A specific basis thus exists for imputing their conduct to USPS.  Wiercinski

v. Mangia 57, Inc., 787 F.3d at 113-14.  Atencio accordingly has shown that she engaged in a

protected activity by seeking an accommodation of her disability, that USPS knew about the

requests for accommodation, and that a causal connection exists between the protected activity and

the hostile environment, which Atencio states began only after October 2011 and generally occurred

when she asked for help to accommodate her disability.  USPS does not dispute these elements.

(See Dkt. No. 69: USPS Br. at 19-24.)

　　　　　USPS does dispute the severity and pervasiveness of the alleged harassment.  (USPS

Br. at 20-21.)  Atencio's allegations, while vague, appear to relate to the entire time period from

October 18, 2011 to her last day of work on January 10, 2013, a total of approximately fifteen

months.  (See pages 6-7 above.)  Although Atencio gives no concrete dates when each instance of

abuse occurred, she states that she "frequently" was subjected to harassment when asking for help,

and outlines what she believes to be a typical "pattern" of abuse on a near day-to-day basis during

the entirety of the relevant time period.  (See page 7 above; Atencio Aff. ¶ 11 ("When I returned to

work [after October 2011], I still had limitations.  So, I had no choice but to make informal requests

for help on a daily basis.").)  Atencio's supervisors, she claims, insulted her limitations, and "literally

scream[ed] at" her if she would ask for help, and made such comments in front of other USPS

employees.  (See page 7 above.)  Atencio additionally states that her supervisors imposed

restrictions on her requests for help by requiring her to use the Form 3996, only to deny her access

to the forms as a "method to torment" her.  (See page 5 above.)  Atencio subjectively perceived the

work environment to be abusive, and states that the abuse from her supervisors left her embarrassed

at work and in tears nearly every evening.  (See page 7 above.)  The Court concludes that, given the

alleged frequency, severity, and humiliating nature of the alleged harassment, Atencio has satisfied

her burden of proving a prima facie case of retaliatory hostile work environment that altered the conditions of her employment and occurred because of her disability.  USPS does not proffer any legitimate nondiscriminatory reason for the supervisors' treatment of Atencio.  It is a close call, and Atencio may (or may not) prevail on the retaliation claim at trial, but USPS is not entitled to summary judgment on Atencio's retaliation claim.[16/]

### CONCLUSION

For the reasons set forth above, USPS's summary judgment motion (Dkt. No. 68) is GRANTED as to Atencio's reasonable accommodation claim, and DENIED as to her retaliation claim.

The Joint Pretrial Order is due August 30, 2016.  The Court will hold the final pretrial conference in this matter on September 8, 2016 at 9:30 A.M.

SO ORDERED.

Dated:      New York, New York
            August 4, 2016

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies to:      All Counsel (ECF)

---

[16/]      Based on the record in this matter, and given Atencio's evident belief that she had been discriminated against, it does not matter that Atencio has not prevailed on her failure to accommodate claim or her disability discrimination claim that was dismissed by Judge Woods.  See, e.g., Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015).  USPS makes no argument to the contrary.